UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

GREGORY H. SMITH, on behalf of himself
and all others similarly situated,

                          Plaintiff,

      vs.

AMARANTH ADVISORS L.L.C.,
AMARANTH LLC, AMARANTH
MANAGEMENT LP, AMARANTH
INTERNATIONAL LTD., AMARANTH
PARTNERS LLC, AMARANTH CAPITAL
PARTNERS LLC, AMARANTH GROUP
INC., AMARANTH ADVISORS
(CALGARY) ULC, BRIAN HUNTER,
MATTHEW DONOHOE, NICHOLAS M.
MAOUNIS, ALX ENERGY, INC., JAMES
DELUCIA, J.P. MORGAN FUTURES, INC.,
and J.P. MORGAN CHASE & CO.,

                      Defendants.

---------------------------------------------------------x

Civil Action No.  07-7943

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Gregory H. Smith, by his undersigned counsel, alleges the claims set forth herein. Plaintiff's claims as to himself and his own actions are based upon his personal knowledge. All other allegations are based upon information and belief and made pursuant to the investigation of counsel. Based upon such investigation, Plaintiff believes that substantial evidentiary support exists for the allegations herein and that such allegations are likely to have additional evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of Plaintiff and all other persons or entities who purchased or sold natural gas futures and options contracts on the New York Mercantile Exchange ("NYMEX") between February 23, 2006 and September 20, 2006, inclusive (the "Class Period").

2.      During the Class Period, in direct violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §1, *et seq.*, Defendants manipulated the prices of NYMEX natural gas options and futures contracts.

3.      For example, Defendants implemented a scheme to lower natural gas prices on the NYMEX to benefit trading positions it held on the InterContinental Exchange ("ICE"), an electronic futures exchange. Defendants purchased large amounts of derivative financial products traded on ICE that would increase in value as the settlement price of natural gas future contracts on the NYMEX decreased. To maximize their profits on those derivative products, Defendants needed to reduce the price of natural gas future contracts traded on the NYMEX to the lowest possible price. Defendants developed a scheme to do just that. Pursuant to that scheme, Defendants took much smaller positions in natural gas future contracts on the NYMEX and sold a disproportionate number of those contracts during the last thirty minutes of trading before the contracts expired. By flooding the market with contracts just before their expiration, Defendants were able to drive down the price of NYMEX natural gas future contracts. Although Defendants made less money on the sale of those

contracts, the corresponding increase in value of the other derivative products held by Defendants more than offset that loss. Indeed, Defendants made hundreds of millions of dollars through their manipulation of the market.

4.      In addition, to further increase the value of their portfolio of financial derivative products, Defendants manipulated the price difference between future contracts for delivery of natural gas during the summer and winter months.

5.      As a direct, proximate and foreseeable result thereof, Plaintiff and the members of the Class have been damaged.

## JURISDICTION AND VENUE

6.      Pursuant to Sections 1a(4) and 22 of the CEA, natural gas is a "commodity" and the "commodity underlying" natural gas futures options contracts traded on the NYMEX. 7 U.S.C. §§1a(4) and 25(a)(1)(D).

7.      This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. §25 and 28 U.S.C. §§1331 and 1337.

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. §25(c), because the claims arose in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. Defendants' unlawful acts manipulated the prices of natural gas futures and options contracts traded in this District on NYMEX, located at One North End Avenue, New York, New York.

## PARTIES

9.      Plaintiff Gregory H. Smith traded NYMEX natural gas futures contracts during the Class Period. Plaintiff was damaged by Defendants' manipulation of the prices of natural gas futures and options contracts on NYMEX.

- 2 -

10.     Defendant Amaranth Advisors, L.L.C. ("Amaranth Advisors") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located at One American Lane, Greenwich, Connecticut.  At all times relevant to this lawsuit, Defendant Amaranth Advisors served an investment advisor to and manager of a number of interrelated entities, which collectively comprised what is commonly referred to as a "hedge fund." On paper, those companies consist of a complex array of interrelated LLCs, LLPs, and corporations organized for the purpose of pooling and investing funds of investors.

11.     Defendant Amaranth LLC ("Amaranth LLC") is a company organized and existing under the laws of the Cayman Islands.  Amaranth LLC serves as a "master fund" in a "master-feeder" fund structure.  Under that structure, investors invest directly into so called "feeder funds," which invest substantially all of their capital in Amaranth LLC.  Amaranth LLC then invests its funds on a global basis in a host of trading vehicles, including natural gas futures and options contracts traded on NYMEX and ICE.

12.     Defendant Amaranth International Limited ("Amaranth International") is a company organized and existing under the laws of Bermuda.  At all relevant times, Amaranth International served in the "master-feeder" fund structure as an off-shore "feeder fund" for non-United States and tax-exempt investors.  Investors invested directly into Amaranth International, which invested substantially all of its capital in Amaranth LLC.

13.     Amaranth Partners LLC ("Amaranth Partners") is a limited liability company organized and existing under the laws of Delaware.  At all relevant times, Amaranth Partners served in the "master-feeder" fund structure as a domestic "feeder fund" for United States taxable investors. Investors invested directly into Amaranth Partners, which then invested substantially all of its capital in Amaranth LLC.

14.     Defendant Amaranth Capital Partners LLC ("Amaranth Capital") is a limited liability company organized and existing under the laws of Delaware.  At all relevant times, Amaranth Capital served in the "master-feeder" fund structure as a domestic "feeder fund" for United States taxable investors.  Investors invested directly into Amaranth Capital, which then invested substantially all of its capital in Amaranth LLC.

15.     Defendant Amaranth Management Limited Partnership ("Amaranth Management") is a limited partnership organized and existing under the laws of Delaware.  Amaranth Management serves as a holding entity which owns 78 percent of Amaranth Advisors.

16.     Defendant Amaranth Group, Inc. ("Amaranth Group") is an S corporation organized and existing under the laws of Delaware.  Amaranth Group is owned by Amaranth LLC's Chief Executive Officer, Defendant Nicholas Maounis.  As of May 1, 2006, Amaranth Group owned one percent and served as general partner of Amaranth Management.  Amaranth Group employed all the natural gas traders on behalf of all of the funds in the master-feeder fund structure.  These traders included Brian Hunter and Matthew Donohoe.  Amaranth Group is a service provider to Amaranth LLC, Amaranth International, Amaranth Partners, and Amaranth Capital.

17.     Defendant Amaranth Advisors (Calgary) ULC ("Amaranth Calgary") is a company organized and existing under the laws of Nova Scotia, Canada.  Amaranth Calgary is registered with the Alberta Securities Commission.  Amaranth Calgary was created to permit Defendant Hunter to move his trading operation from Greenwich, Connecticut to Calgary, Alberta.  However, even after the move, most of the Amaranth Calgary's officers were based in Connecticut, as were the employees assigned to perform support functions for Amaranth Calgary's trading operation.

18.     Collectively, Amaranth Advisors, Amaranth LLC, Amaranth International, Amaranth Partners, Amaranth Capital, Amaranth Management, Amaranth Group, and Amaranth Calgary are

referred to herein as the "Amaranth Entity Defendants." At the close of 2005, the Amaranth Entity Defendants employed more than 600 people in Greenwich, Connecticut and seven other offices worldwide and controlled in excess of $8 billion in assets. Although Amaranth trading operations ceased in 2006, the Amaranth Entities had more than $600 million in assets as of July 2007.

19.    Defendant Nicholas M. Maounis ("Maounis") is a citizen of Connecticut. Maounis was the founder and, at all relevant times, the Chief Executive Officer and Managing Member of Amaranth Advisors. Due to their interlocking nature, the Amaranth Entity Defendants were an association-in-fact, which was *de jure* and *de facto* controlled by Maounis and which acted under his direction and at his behest.

20.    Defendant Brian Hunter ("Hunter") is a citizen of Canada. At all relevant times, Hunter served as the President of Amaranth Calgary and was the head natural gas trader for the Amaranth Entity Defendants. Although he was physically stationed in a Calgary, Alberta office, natural gas traders working under Hunter's supervision worked from Greenwich, Connecticut, as did the risk management and compliance personnel who oversaw Hunter's trading. In 2005, Hunter earned approximately $100 million.

21.    Defendant Matthew Donohoe ("Donohoe") is a citizen of Canada. At all relevant times, Donohoe was Hunter's "execution trader" who would implement Hunter's micro strategy by placing orders for the Amaranth Entity Defendants with NYMEX floor brokers. In addition, Donohoe would execute trades with counterparties.

22.    Collectively, Hunter and Donohoe are referred to herein as the "Amaranth Traders." Collectively, Amaranth Traders, Amaranth Entity Defendants, and Maounis, are referred to herein as the "Amaranth Defendants" or "Amaranth."

23.    Defendant ALX Energy, Inc. ("ALX") is a corporation organized and existing under the laws of New York.  At all relevant times, ALX was the primary NYMEX natural gas floor brokerage firm for Amaranth, which was ALX's largest customer.  Throughout the Class Period, ALX had knowledge of, and aided and abetted, Amaranth's manipulation of the prices for NYMEX natural gas futures and options in violation of the CEA.

24.    Defendant James DeLucia ("DeLucia") is a citizen of the United States.  At all relevant times, DeLucia served as Chairman and/or Chief Executive Officer of ALX.  DeLucia was the principal floor broker on NYMEX for natural gas.  Throughout the Class Period, DeLucia had knowledge of, and aided and abetted, Amaranth's manipulation of the prices for NYMEX natural gas futures and options in violation of the CEA.

25.    Collectively, ALX and DeLucia are referred to herein as the "ALX Defendants."

26.    Defendant J.P.Morgan Futures, Inc. ("Morgan Futures") is a corporation organized and existing under the laws of Delaware and is a CFTC-registered futures commission merchant.  At all relevant times, Morgan Futures served as Amaranth's clearing broker at NYMEX.  Morgan Futures aided and abetted Amaranth's manipulation of the prices for NYMEX natural gas futures and options in violation of the CEA.

27.    Defendant J.P. Morgan Chase & Co. ("JPMC") is a corporation organized and existing under the laws of Delaware with its principal place of business located at 270 Park Avenue, New York, New York.  JPMC is the parent of Morgan Futures over which it maintained *de jure* and *de facto* control at all relevant times.

28.    Collectively, Morgan Futures and JPMC are referred to herein as the "JPM Chase Defendants."

29.     The acts and occurrences alleged herein were all authorized and committed by the Defendants or their officers, agents, employees or representatives while actively engaged in the management of each Defendant's affairs.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who purchased and/or sold NYMEX natural gas futures and options contracts between February 23, 2006 and September 20, 2006 (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants and their parents, subsidiaries, affiliates and their employees, officers, directors, members of their immediate families, and their legal representatives, heirs, successors or assigns.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Members of the Class may be identified from records maintained by NYMEX and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in this type of class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' manipulation of NYMEX natural gas futures contract prices violated the CEA;

(b)     whether Defendants' conduct affected the prices of NYMEX natural gas futures contracts and options purchased and sold by Class members during the Class Period; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

36.     The manipulation in this case involves interrelated markets used to trade natural gas. The first market is the market for natural gas futures contracts, which are traded exclusively on NYMEX.  NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. §7.

37.     The second market is one for a variety of "derivative" financial products, most of which are termed "swaps," some of which are traded on NYMEX and others of which are traded "over the counter" on exchanges such as ICE, which are exempt from a variety of regulations under the CEA. These over-the-counter derivative products all derive their value based on the "settlement price" of NYMEX natural gas futures contract for a given month.  Thus, the settlement price of NYMEX natural gas futures contract determines, in whole or in part, the value of the derivatives.

**Trading Natural Gas Future Contracts on NYMEX**

38.     A futures contract is an agreement to purchase or sell a commodity for delivery in the future.

39.     Each future contract has two sides.  The seller is on the "short" side of the contract and is obligated to make delivery of the commodity on the designated delivery date.  The buyer is on the "long" side of the contract and is obligated to take delivery of the commodity if the buyer holds the contract until the delivery date.

40.     At all relevant times, the natural gas futures contracts were principally traded in an "open outcry" market on NYMEX trading floor.  NYMEX is an open and continuous auction by NYMEX members who are acting on behalf of their customers, the brokerage companies they represent, or themselves.  It is referred to as "open outcry" because, instead of a single auctioneer selling an item, every member on the floor or "pit" can shout out bids (*i.e.*, prices at which they are willing to buy a contract) or offers (*i.e.*, the prices at which they wish to sell a contract).

41.     The activity conducted in the NYMEX "pit" results in an efficient market clearing mechanism.  NYMEX floor traders stand in the trading rings or pits with wide steps descending from the trading floor to the center of the pit.  Brokers' phone clerks, who are outside the trading pit area, take orders from customers and typically record those orders on small slips of paper, noting the volume of the order, the terms requested and any other information pertinent to the execution of the order.  Another broker employee physically delivers the orders to the floor traders in the ring, or the orders may be verbally transmitted to the floor broker.  Floor traders who wish to accept a bid or offer do so by shouting at and gesturing (using well known pit gestures) to the trader making the bid or offer.  Traders are able to detect in real time the status and direction of pricing and volumes by visually and audibly monitoring the trading behavior of other brokers in the ring.  When a floor broker with a large order to sell begins to offer to sell contracts serially and in rapid succession, and other brokers quickly accept or "lift" the offers, experienced brokers who may have orders to buy will perceive the intentions of the large seller.  Rather than bidding at prevailing prices and having

sellers "hit" their bids, they will wait for the large seller to offer at a lower price and then "lift" those offers at such lower prices. In such a manner, the large seller has the ability to move the prevailing prices in the ring in a downward direction.

42.     When a trade is executed, each selling broker must record each transaction on a card about the size of an index card which shows the commodity, quantity, delivery month, price, broker's badge name and badge name of the buyer. The pit card must be tossed (physically) into the center of the trading ring within one minute of the completion of a transaction. A NYMEX employee sits in the center of the trading ring, collects and time-stamps the cards, and the data on the card is then entered into a NYMEX central computer system. In addition, most brokers will record the essential terms of the execution on the same slips of paper their firms created with respect to the client orders.

**Natural Gas Future Contracts Settlement Prices**

43.     Other than price, every aspect of a futures contract traded on NYMEX is standardized.

44.     The natural gas futures contract "settlement price" is the volume-weighted average price of trades made during the "settlement period," which is the last 30 minutes of trading on the termination day for the "prompt-month" contract. The "prompt-month" is the next calendar month. The "termination day" for the natural gas futures contract is the third-to-last business day of the month preceding the prompt month, and the settlement period occurs from 2:00 p.m. to 2:30 p.m. on the termination day. For example, in August 2007, the prompt-month contract was the September 2007 natural gas futures contract. The last business day for August 2007 was Friday, August 31, so the settlement period for the September 2007 natural gas futures contract took place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.

45.    The "futures" contract for the prompt month becomes a present contractual obligation for the purchase and sale of the physical gas.  Buyers of contracts must take delivery and sellers thereof must make delivery of 10,000 MMBtu per contract over the course of the contract month, at the buyer's interconnection on the Sabine Pipe Line Co.'s Henry Hub in Louisiana.

46.    The price for the gas that goes to delivery is the settlement price of the natural gas futures contract.

47.    However, few futures market participants hold their positions to the end of the settlement period for the prompt-month contract.  Therefore, most contracts do not "go to delivery."

48.    In fact, most market participants avoid even trading during the settlement period due to increased price risk and volatility and decreased trading interest from other participants.  Instead, most market participants liquidate or transfer (a/k/a "roll") their position into later contract months their open positions in the prompt-month natural gas futures contract well before the settlement period.

**The Price of Natural Gas Futures Contracts Determines the Price of Derivatives**

49.    The natural gas futures contract final settlement price in large part determines the settlement price for a wide range of natural gas derivatives, including natural gas futures "swaps" and "basis swaps."  A "basis swap" is a derivative instrument whose value is based on the difference between the settlement price of the natural gas futures contract for a given contract month and that of the monthly "index" at a specified location for that same month.  Certain "options" can also settle on the final natural gas futures contract settlement price.

50.    A natural gas futures "swap" is a financial instrument that operates much like the natural gas futures contract, except that it settles financially at the termination of the natural gas futures contract at the natural gas futures contract's final settlement price.  Unlike a natural gas futures contract, it never requires the physical delivery of gas.  The buyer in a swap transaction for a

given contract month agrees to pay the seller a "fixed price," *i.e.*, a specific amount determined at the time when the transaction occurs. The seller pays the buyer a "floating price" equal to NYMEX (Henry Hub) natural gas futures contract final settlement price for the corresponding contract month on the last trading day for that contract month. The floating price is not known at the time of the swap transaction. Thus, buyers and sellers hope to profit based on the relation between the price paid at the time of the transaction and the ultimate settlement price of the natural gas futures contract: the buyer of the swap profits if the floating price (*i.e.*, the actual final natural gas futures contract settlement price) is higher than the fixed price at which the swap is trading at the time that the transaction takes place; the seller profits if the floating price is lower than the fixed price.

51. A natural gas futures "option" is a contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of futures for a particular contract month at a specific price within a specified period of time, regardless of the futures market price. If an option is exercised, or "assigned," a futures position is established. A natural gas future created from an option can be liquidated by making an offsetting purchase or sale, or can go to delivery.

52. An option can be either a "call" or a "put." Buyers of natural gas futures "call" options traded on NYMEX have the right, but not the obligation, on the expiration day to purchase one natural gas futures contract at the "strike price," which is a price specified at the time the option is written. On the other side of the transaction, sellers (or "writers") of the call have the obligation to sell one natural gas futures contract at the strike price to the buyers of the call, in the event the option is exercised. Similarly, buyers of a "put" option have the right, but not the obligation, on the expiration day to sell one natural gas futures contract at the strike price, while the sellers of the put have an obligation to buy one natural gas futures contract at the strike price from the buyer upon exercise. In either case, the buyer of the put or call makes an initial payment to the writer of the put

or call, referred to as the option premium. Traders can also buy and sell options on purely financial contracts, such as swaps.

53.    As with the other natural gas derivatives, the value of options is directly related to the price of the natural gas futures contract. While options on prompt-month futures and other derivatives expire on the day before the termination day, trading during the settlement period on the termination day continues to affect the value of options on future-month instruments. Trading during the last two minutes on the termination day is particularly important, as options continue to trade at prices in relation to the price of the expiring natural gas futures contract. Options and other derivatives are given a non-final settlement price based on trading during these two minutes, which determines the options' marked-to-market value for that day, and which represent values of the gains or losses in each contract position resulting from changes in the price of the futures or option contracts at the end of each trading session.

**Hunter's Trading Operation for Amaranth**

54.    In 2004, Amaranth hired Hunter. Eventually, Maounis promoted Hunter to Vice President of Amaranth and made him "co-head" of commodities trading.

55.    In June 2005, Maounis doubled Hunter's commission from profits on his trading desk from 7.5% to 15%. As a result, Hunter's personal compensation in 2005 totaled approximately $100 million.

56.    Pursuant to NYMEX restrictions, trading positions are limited to 1,000 natural gas futures contracts equivalents. As Hunter began to ramp up his natural gas trading operation in the summer of 2005, Amaranth applied for and received from NYMEX an exemption raising Amaranth's position limits to 3,000 natural gas futures contracts equivalents.

57.    Later in 2005, Hunter moved his trading desk from Greenwich to Calgary. Four other Amaranth traders, including Donohoe, followed Hunter to Calgary. However, Amaranth did not

assign any senior management, risk management or compliance personnel to Calgary. They all continued to work in Greenwich.

**Amaranth Begins to Manipulate the Price of Natural Gas Futures Contracts in February 2006**

58.     At various times throughout the Class Period, on behalf of Amaranth, Hunter, along with Donohoe, manipulated the settlement price of the natural gas futures contracts by holding the Amaranth Entities' natural gas futures contract positions open until the beginning of the settlement periods, then liquidating the positions by selling them during the settlement period. The purpose of these last minute trades was to influence the settlement price in order to benefit Amaranth's positions in financially-settled swaps and options.

59.     Buying or selling during the settlement period has the ability to move prices up or down, respectively, either as a result of: (i) the sheer volume of contracts traded, (ii) unilateral manipulative floor trading practices (*e.g.*, instructing or positioning the floor broker to signal to other floor brokers the plan so as to boost the market-moving effect); or (iii) explicit or tacit collusion (*e.g.*, with other traders who recognize the manipulator's intent and want to help him move the market with tag-along benefits to their own positions). In any case, for such a strategy to have a significant impact on the settlement price, which is a volume-weighted average, a would-be manipulator would have to account for, or propagate, a significant portion of the trading volume during some portion of the settlement period and the market would have to be fairly concentrated for some portion of the settlement period.

60.     In isolation, a strategy to manipulate the price of natural gas futures contracts typically results in a loss for the manipulator because large scale selling of the natural gas futures contract to liquidate a long position (or buying to liquidate a short position) would normally reduce the value received. However, a manipulator could make large sums of money through such

manipulation by setting up a portfolio with opposing swaps or physical positions that are much greater in scale than the natural gas futures contract position. That is precisely what Defendants did here.

61.    Prior to the Class Period, Amaranth never traded a large number of contracts in the 30 minute settlement period.

62.    On the morning of February 24, 2006, Amaranth was short 1,729 futures contracts. Accordingly, Amaranth needed to buy 1,729 March natural gas futures contracts to have a net position of zero.

63.    However, on the prior day, February 23, 2006, Hunter instructed Donohoe to "make sure we have lots of futures to sell MoC tomorrow." "MoC" means market on close. A MoC order is an instruction to fill the order, at market, but only in the closing range.

64.    Hunter instructed Donohoe to buy a large number of March natural gas futures contracts before the close the next day so that Amaranth would have "lots" of natural gas futures contracts to sell MoC, that is, during the close. Hunter knew that he would be able to drive down the price of March natural gas future contracts by selling "lots" of them at the close.

65.    Despite the fact that Amaranth only needed to buy 1,729 March natural gas futures to be flat, Amaranth bought in excess of 4,800 March natural gas futures contracts the next day.

66.    This excess buying was part of Hunter's plan to manipulate the settlement price downward for the March natural gas futures contract by selling over 3,000 contracts market on close.

67.    In a series of instant message exchanges during February 24, 2006, Donohoe gave Hunter periodic updates on his position in the March natural gas futures contract, and Hunter provided further detailed instructions on the implementation of their strategy. For example, in an instant message conversation beginning at 11:02 a.m., Donohoe informed Hunter that he had already

liquidated the short position of 1,729 March natural gas futures contracts and had reached a long position of 2,111.  Hunter then instructed Donohoe to further build his position to be long at least 3,000 contracts.  The instant message correspondence  stated:

| Donohoe: | 11:02:52 | i'm long 2111 fut |
| Hunter: | 11:03:20 | already? |
| Donohoe: | 11:03:43 | vitol sold 2000 |
| Hunter: | 11:04:12 | maybe get to 3000 |
| Donohoe: | 11:04:17 | I can easily get 2000 or mor |

68.    By 12:22 p.m., Donohoe had achieved the goal of reaching a long position of more than 3,000 March natural gas futures contracts.

69.    At that time, Donohoe asked Hunter whether he should purchase any more.  Hunter told Donohoe not to do so.  Accordingly, Donohoe did not trade any more March natural gas futures contracts until the settlement period, so that he could carry out Hunter's previous instruction that all of these contracts were to be sold in the close and thereby reduce the price.

70.    At or about that time, Hunter contacted ALX, Amaranth's primary NYMEX floor brokerage firm, and specifically Vincent Rufa, one of ALX's phone clerks, in order to advise him of Amaranth's manipulative intentions so that when it came time to execute the trades, ALX would have considered, in advance, how to execute the order so as to maximize the intended effect.

71.    As a result of ALX's selling activity, traders in the pit learned that Amaranth would be a large seller at the close.

72.    In addition, Hunter admitted to other traders that Amaranth needed the price of natural gas futures contracts fall dramatically.  For example, in an instant message to another Amaranth natural gas trader, Hunter confided that he needed the price of March natural gas futures contracts to "get smashed on settle."

73.    Similarly, Hunter had the following instant message exchange with Bart Glover of National Trading LLC:

| Hunter: | We have 4000 to sell MoC . . . shhhh |
|---------|--------------------------------------|
| Glover: | come on |
| Hunter: | y |
| Glover: | unless you are huge bearish . . . why the f would yo do that |
| Hunter: | all from options yesterday . . . so well see what the floor has. bit of an expiriment mainly |
| Glover: | what the f . . . that is huge |

74.     Donohoe carried out Hunter's instructions by placing a series of six orders to ALX from 2:00 p.m. to 2:28 p.m., in which he directed ALX to sell a total of 3,111 natural gas futures contracts.

75.     Donohoe did not place MoC orders, which would have directed the broker to sell the contract in the closing range but provided the broker discretion as to the timing of the sale to get the best price.  Rather, Donohoe specifically placed "market orders," which instructed the brokers to sell immediately at whatever price is obtainable at the time.

76.     On all the floor trading tickets created in the pit by ALX when Amaranth phoned in its orders, the price column is left blank, indicating that Hunter was indifferent to the price received for these contracts, as long as they were sold.

77.     Importantly, the first trade tickets, time stamped at 1:59 p.m., indicated an order to sell 500 contracts, which represents by far the largest sale in the opening minutes of the close. Moreover, the notes on the ticket pertaining to executions in the pit show relatively higher priced transactions occurring rapidly in small lot sizes accompanied by the rapid drop in prevailing prices.

78.     Once the prevailing market price dropped from approximately $7.40 at 2:00 p.m. to approximately $7.10 sometime around 2:08 p.m., Amaranth began to fill larger size orders rapidly at the lower prices.  This activity strongly fits the profile of a large seller signaling to the pit the intention to be a large seller and inducing buyers to hold off on aggressive bidding, waiting instead for progressively lower offers.

79.     At 2:15 p.m., during the settlement period, Hunter and Donohoe began congratulating themselves:

Hunter:         today came together quite nicely . . . We'll hit the rest near the end of this

80.     Then, at around 2:30 p.m., as the settlement period ended, Hunter and Donohoe continued their instant message exchange:

Donohoe:        h [March natural gas futures contract] will settle lower . . . and h/j [March April spread] wider . . . nice . . .
Hunter:         I am flexing here
Donohoe:        looking preety bang on . . . . lol . . . rrrrrrrrrrrrrrrrrrr
Hunter:         hahahahaha

**Amaranth Profited Immensely as a Result of Its February 2006 Market Manipulation**

81.     Prior to driving down the price of natural gas future contracts, Amaranth had taken a position in the derivative March swaps that was short by 13,167.5 futures contract equivalents.  In addition, Amaranth maintained short position by 16,613.25 contracts in the "prompt-next" or April natural gas futures contract.

82.     The value of both of these positions increased proportionate to the decline in the March natural gas futures contract settlement price.  Amaranth profited by approximately $27 million solely from its manipulation of the March natural gas futures contract settlement price, contributing in large part to the total one-day net trading profits for Hunter's group of $45,350,447.

**Amaranth Continues to Manipulate the Price of Natural Gas Futures Contracts Throughout the Class Period**

83.     Amaranth continued to manipulate the prices for natural gas futures contracts.  For example, on March 29, 2006, Amaranth accumulated a large long position in the April natural gas futures contract prior to the settlement period, and proceeded to sell it "MoC" during the close.

84.     In particular, Amaranth started March 29, 2006 long 1,603 April natural gas futures contracts.

85.     In three separate orders, Amaranth directed ALX to sell 303 April natural gas futures contract prior to the close between 12:41 p.m. and 1:50 p.m.  At 2:00 p.m. and 2:03 p.m., Amaranth placed further orders for ALX to sell 100 April natural gas futures contracts and 1,200 April natural gas futures contracts MoC.

86.     During the prior week, Amaranth built its aggregate April swap position from being short roughly 9,500 futures contract equivalents at the end of the day on March 21 to short 17,884 futures contract equivalents at the end of the day on March 29.  Thus, although the amount of natural gas futures contract selling was less than the selling of the March contracts, the number of short swap contracts that stood to benefit from lowered NYMEX natural gas futures contract prices was much greater.

87.     Amaranth profited by more than $11,200,000 from its manipulation of the April natural gas futures contract on March 29, 2006.

88.     Amaranth's trading patterns and the evolution of its positions in the April natural gas futures contract and April swaps evidence an intent to artificially reduce the settlement price of the April natural gas futures contract.  While Amaranth reversed its natural gas futures position from short to long on March 23, 2006, it maintained a short swap position through the end of the day on March 29, 2006 that significantly exceeded the long natural gas futures position.  This demonstrates that its true aggregate position was net short.  Amaranth held on to the majority of its long natural gas futures contract position until the beginning of the settlement period, when it sold 1,300 contracts, including a single 1,200 contract MoC order.  The intent and effect of such trading was to drive down the settlement price.

89.     Similarly, on April 26, 2006, the settlement day for the May natural gas futures contract, Amaranth again manipulated the price of natural gas futures contracts.

90.     Amaranth began April 26, 2006 with a long position of 3,044 May natural gas futures contracts.  In instant messages between Hunter and David Chasman, an Amaranth energy risk manager in Greenwich, Connecticut, which took place seven minutes into the start of the settlement period, Hunter explained that he was still "waiting to sell" his May natural gas futures contracts.

91.     In fact, Donohoe placed orders with three separate brokers (TFS, Gotham, and ALX) to sell these 3,044 contracts in a highly orchestrated fashion starting at 2:22 p.m.

92.     Order tickets and audio recordings show that Donohoe instructed two of the three brokers to wait to begin selling until 2:22 p.m., which is the last eight minutes that the market was open.  The phrase "last 8 minutes" is written on the order tickets for Gotham and TFS, while the order ticket for ALX – for 2000 May natural gas futures contract – is time stamped at 2:22 p.m.  Also, a taped telephone line at Gotham captured Donohoe and brokers at Gotham, as follows:

| | |
|---|---|
| Barry: | Gotham, Dave |
| Donohoe: | TJ |
| T.J.: | Gotham T |
| Donohoe: | Hey |
| T.J. | Hey, Matty what's up? |
| Donohoe: | In the last eight minutes . . . |
| T.J.: | Yes? |
| Donohoe: | I need you to sell five hundred and forty four Mays |
| T.J.: | In the last eight minutes sell 544 Mays |
| Donohoe: | Yes |
| T.J.: | You got it, my friend |

93.     Thus, Amaranth not only waited to sell in the settlement period, but waited to sell in the final minutes of the settlement period, in order to ensure that its manipulative scheme would have the maximum impact.

94.     Amaranth made more than $20,500,000 million from its manipulation on April 26, 2006.

**The ALX Defendants and JPM Chase Defendants Participate in the Market Manipulation**

95.    By letter to Amaranth dated August 2, 2006, NYMEX compliance department expressed its concern over Amaranth's trading of natural gas futures contracts during the final minutes of trading on April 26, 2006.  In that letter, NYMEX noted that Amaranth sold 99% of its contracts in the final four minutes of the close and 78% of its contracts in the last minute of the close on that day.

96.    NYMEX demanded that Amaranth provide a written explanation of the commercial need and justification for its trading.

97.    Amaranth responded to NYMEX's inquiry with a letter dated August 15, 2006 that falsely described Amaranth's trading.  Amaranth's August 15, 2006 response concealed that Amaranth had provided its floor brokers with specific instructions to execute trades during the last eight minutes of trading.  Rather, Amaranth falsely claimed that it had not even decided to trade its March natural gas futures contracts until 2:17 p.m., at the earliest.

98.    Also in August 2006, following Amaranth exceeding NYMEX gas speculative trading limits several times, NYMEX ordered Amaranth to reduce its holdings of natural gas futures contracts.  Amaranth reduced its positions on NYMEX by surreptitiously shifting those positions to ICE.

99.    Following the shift of its positions to ICE, Amaranth traded on ICE in such a manner as to increase its overall position in natural gas, rather than reduce its position as mandated by NYMEX.

100.    Morgan Futures, with the knowledge of JPM Chase, carried and financed these trades while aware that Amaranth shifted its positions from NYMEX to ICE following NYMEX's direction for Amaranth to reduce its natural gas holdings.

- 21 -

**Amaranth Engaged in Illegal Speculation during the Class Period**

101.    Throughout the Class Period, Amaranth was the largest natural gas trader in the United States.  As such it accumulated massive natural gas holdings on NYMEX and ICE.

102.    Amaranth's position in the natural gas market constituted excessive speculation.

103.    During the Class Period, Amaranth purchased and sold thousands of natural gas contracts on a daily basis.  In fact, Amaranth held approximately 100,000 natural gas contracts during a single month in the Class Period.  This equals 5% of the United States' annual consumption of natural gas.

104.    At other times during the class period, Amaranth was involved with 40% of the contracts on NYMEX for natural gas during the winter heating season.  For example, in November 2006, Amaranth controlled 70% of the contracts to deliver natural gas.  In addition, every day from mid-February through July 2006, Amaranth controlled more than 50% of the open interest on NYMEX for November 2006 and January 2007 natural gas futures contracts.

105.    At one point during July 2006, Amaranth held enough NYMEX and ICE January 2007 natural gas futures contracts to satisfy the entire country's natural gas consumption during that month.

106.    By accumulating and trading large volumes of natural gas futures on NYMEX and ICE, Amaranth improperly affected the price of natural gas futures, which resulted in increased price volatility.

107.    Through its excessive holdings, Amaranth was able to and did drive up the price of NYMEX natural gas futures contracts from February through August 2006.

108.    In 2006, natural gas inventories were higher than they had been historically. Nonetheless, there was an unusually high price differences (a/k/a "price spreads") between natural

gas for delivery in the winter as compared to the summer of 2006. The reason for this was Amaranth's excessive trading.

109.    Specifically, Amaranth purchased contracts to deliver natural gas for delivery in the 2006 winter heating season. Amaranth also sold contracts to deliver natural gas in the summer months of 2006. In combination, Amaranth's massive purchases and sales caused the large scale price spread, which resulted in purchasers of natural gas paid artificially inflated prices due to Amaranth's speculative trading.

110.    The Senate Permanent Subcommittee on Investigations conducted an investigation that confirmed that Amaranth's trading caused the price spread.

111.    The Amaranth Defendants intentionally caused the prices for NYMEX natural gas futures contracts to trade at artificial levels in order to profit from the price spreads that they created.

112.    Despite knowing that Amaranth was improperly affecting the price of natural gas future contracts and violating NYMEX position limits, the JMP Chase Defendants continued to finance Amaranth's trades.

**The Price of Natural Gas Drops as Amaranth's Scheme Unravels**

113.    By the middle of September 2006, other traders also sought to capitalize on the artificial price spreads created by Amaranth. Due to the large supply of natural gas, this increased trading caused the price spreads to tighten.

114.    By this time, Amaranth already had amassed large positions for the delivery of natural gas during the winter of 2006-2007. However, as the price spread lessened, Amaranth incurred huge losses on its position.

115.    Due to its increasing financial losses, Amaranth no longer had the capital necessary to manipulate the market for natural gas.

116. Lacking adequate collateral for Amaranth's margin debt, the JPM Chase Defendants required that Amaranth reduce its exposure in natural gas.

117. However, due to its large holdings, Amaranth could not simply sell its interest in the open market because if it were to do so, the market would collapse. Rather, Amaranth needed to reduce it holdings through private transactions.

118. Amaranth began to frantically shop its natural gas position. Its efforts led to a deal with Goldman Sachs on September 18, 2006 that would have lowered Amaranth's exposure to natural gas. However, the JPM Chase Defendants refused to deliver Amaranth's cash collateral to Goldman Sachs because they claimed that the deal between Goldman Sachs and Amaranth did not adequately protect the JPM Chase Defendants from exposure to losses resulting from Amaranth's continued trading activities.

119. Two days later, the JPM Chase Defendants took over Amaranth's natural gas trading portfolio and were able to earn $725 million from doing so.

120. As a result of its losses, which totaled more than $2 billion in the first three weeks of September 2006, Amaranth was forced to liquidate it $8 billion hedge fund.

121. Amaranth's liquidation caused the inflation of the price of natural gas futures contracts to be removed from the market. As a result, the price of natural gas plunged. Indeed, October natural gas futures fell by more than 43% and the price for the immediate delivery of natural gas fell by more than 51%.

122. On June 25, 2007, the U.S. Senate Permanent Subcommittee on Investigations issued a press release regarding its investigation into Amaranth and its trading activities. According to Senator Carl Levin: "In 2006, excessive speculation by a single large hedge fund, Amaranth

Advisors, altered natural gas prices, caused wild price swings, and socked consumers with high prices."

123.    The Senate Subcommittee made the following findings, among others:

FINDINGS

(1)    A single hedge fund, Amaranth Advisors LLC, dominated the U.S. natural gas market in 2006.

    (a)    Amaranth accumulated massive natural gas holdings on NYMEX and ICE spanning five years, from 2006-2010.

    (b)    Amaranth accumulated such large positions and traded such large volumes of natural gas in 2006, on both NYMEX and ICE, that it had a direct effect on U.S. natural gas prices and increased price volatility in the natural gas market.  The larger than usual differences between winter and summer futures prices that prevailed during the spring and summer of 2006 were largely the result of Amaranth's large-scale trades rather than the normal market interaction of many buyers and sellers.

    (c)    Amaranth's 2006 positions in the natural gas market constituted excessive speculation.

(2)    In August 2006, Amaranth traded natural gas contracts on ICE rather than on NYMEX so that it could trade without any restrictions on the size of its positions.

    (a)    When NYMEX directed Amaranth to reduce its positions in September 2006 and October 2006 natural gas futures contracts, Amaranth simply transferred those positions to ICE, an unregulated market, thereby maintaining its overall speculative position in the natural gas market.

    (b)    NYMEX's attempt to limit speculative trading during the last day of trading on the September 2006 natural gas futures contract failed, because neither NYMEX nor the CFTC had any authority, mandate, or ability to limit trading on ICE that affected the pricing of NYMEX futures contract.

(3)    Amaranth's actions in causing significant price movements in the natural gas market demonstrate that excessive speculation distorts prices, increases volatility, and increases costs and risks for natural gas consumers, such as utilities, who ultimately pass on inflated costs to their customers.

     (a)    Purchasers of natural gas during the summer of 2006 for delivery in the following winter months paid inflated prices due to Amaranth's speculative trading.

     (b)    Many of these inflated costs were passed on to consumers, including residential users who paid higher home heating bills.

    (4)    The two major U.S. exchanges that trade natural gas – NYMEX and ICE – affect each other's prices.

     (a)    Significant volumes of natural gas are traded on both NYMEX and ICE, and both markets play a key role in setting U.S. natural gas prices.

     (b)    The contracts used on NYMEX and ICE to trade natural gas, called futures contracts on NYMEX and swaps on ICE, are equivalent financial products that serve the same risk-management purposes.

     (c)    Traders routinely buy and sell natural gas contracts on both NYMEX and ICE, and hold positions in both markets.

     (d)    The price of NYMEX futures and ICE swaps are virtually identical up until the final half hour of the last trading day of NYMEX contract, when NYMEX and ICE prices typically differ by a few cents at most.

## SCIENTER ALLEGATIONS

124.    The Amaranth Defendants had both the motive and opportunity to manipulate the prices of NYMEX natural gas futures and options contracts.

125.    As the largest participant in the natural gas trading market, Amaranth had the opportunity to, and did, dominate and control the prices on NYMEX for natural gas.

126.    Amaranth's substantial holdings of financial derivative products traded on ICE provided it with the motive to commit its market manipulation. By using its market power to decrease the price of natural gas futures contracts on NYMEX, Amaranth was able to earn hundreds of millions of dollars from the short positions that it had taken on ICE.

127.    The ALX Defendants had the motive and opportunity to aid and abet Amaranth's manipulative scheme.

128.    As their biggest customer, the ALX Defendants were beholden to Amaranth.  Thus, despite their knowledge of Amaranth's illegal market manipulation, the ALX Defendants willfully aided and abetted Amaranth's manipulative scheme.

129.    The ALX Defendants derived substantial revenue in the form of commissions from the trades they executed on Amaranth's behalf.

130.    The JPM Chase Defendants also had the motive and opportunity to aid and abet Amaranth's scheme to manipulate NYMEX natural gas prices.

131.    The JPM Chase Defendants had virtually unlimited capital that they could use to finance Amaranth's highly levered trades.  However, the JPM Chase Defendants would only profit if Amaranth scheme was successful.  Thus, despite their knowledge of the illegal nature of Amaranth's manipulation, the JPM Chase Defendants continued to finance Amaranth's natural gas trading.

132.    The JPM Chase Defendants indeed profited from the market manipulation.  They earned huge commissions and interest on margin loan balances from Amaranth.

## EFFECTS

133.    As a result of Amaranth's illegal manipulation, the prices of natural gas futures and options contracts were set at artificial levels, which damaged Plaintiff and the members of the Class in an amount to be determined at trial.

## COUNT I

### Violations of the Commodity Exchange Act
### (Against Amaranth Defendants)

134.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

135.    The Amaranth Defendants, aided and abetted by one another, manipulated the price of NYMEX natural gas futures and options contracts during the Class Period in violation of Section 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§13(a) and 25(a).

136.    Plaintiff and the members of the Class purchased and sold NYMEX natural gas futures and options contracts at artificially manipulated prices during the Class Period.

137.    Plaintiff and the members of the Class are entitled to damages in an amount to be determined at trial.

## COUNT II

### Aiding and Abetting Violations of the Commodity Exchange Act
### (Against the ALX Defendants)

138.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

139.    The Amaranth Defendants manipulated the price of NYMEX natural gas futures and options contracts during the Class Period in violation of Section 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§13(a) and 25(a).

140.    The ALX Defendants knowingly and willfully aided, abetted, counseled, induced and/or procured the Amaranth Defendants' violations of the Commodity Exchange Act.

141.    The ALX Defendants were Amaranth's principal NYMEX broker and floor trader. Notwithstanding that the ALX Defendants were advised that Amaranth's trades were designed to unlawfully manipulate the price of NYMEX natural gas futures and options contracts, the ALX Defendants aided and abetted such manipulation by executing trades for Amaranth.

142.    The ALX Defendants willfully and intentionally assisted the market manipulation to cause the price of NYMEX natural gas futures and options contracts to trade at artificial prices

during the Class Period, in violation of Section 22(a)(1) of the Commodity Exchange Act. 7 U.S.C. §25(a)(1).

143.    Plaintiff and the members of the Class purchased and sold NYMEX natural gas futures and options contracts at artificially manipulated prices during the Class Period.

144.    Plaintiff and the members of the Class are entitled to damages in an amount to be determined at trial.

## COUNT III

### Aiding and Abetting Violations of the Commodity Exchange Act
### (Against the JPM Chase Defendants)

145.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

146.    The Amaranth Defendants manipulated the price of NYMEX natural gas futures and options contracts during the Class Period in violation of Section 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§13(a) and 25(a).

147.    The JPM Chase Defendants knowingly and willfully aided, abetted, counseled, induced and/or procured the Amaranth Defendants' violations of the Commodity Exchange Act.

148.    Notwithstanding that the JPM Chase Defendants were aware that Amaranth's trades were designed to unlawfully manipulate the price of NYMEX natural gas futures and options contracts., the JPM Chase Defendants aided and abetted such manipulation by providing financing for Amaranth and executing trades on its behalf.

149.    The JMP Chase Defendants willfully and intentionally assisted the market manipulation to cause the price of NYMEX natural gas futures and options contracts to trade at artificial prices during the Class Period, in violation of Section 22(a)(1) of the Commodity Exchange Act. 7 U.S.C. §25(a)(1).

150.    Plaintiff and the members of the Class purchased and sold NYMEX natural gas futures and options contracts at artificially manipulated prices during the Class Period.

151.    Plaintiff and the members of the Class are entitled to damages in an amount to be determined at trial.

## COUNT IV

### Control Person Liability
### (Against the Defendants Maounis)

152.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

153.    The Amaranth Defendants manipulated the price of NYMEX natural gas futures and options contracts during the Class Period in violation of Section 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§13(a) and 25(a).

154.    Defendant Maounis directly controlled the Amaranth Defendants.  As a controlling person, Defendant Maounis is liable for the manipulation set forth herein pursuant to Sections 4(b) and 13(b) of the Commodity Exchange Act.  7 U.S.C. §§6(b), 13(b).

155.    Plaintiff and the members of the Class purchased and sold NYMEX natural gas futures and options contracts at artificially manipulated prices during the Class Period.

156.    Plaintiff and the members of the Class are entitled to damages in an amount to be determined at trial.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, costs and expert fees; and

(d)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  September 10, 2007        COUGHLIN STOIA GELLER
           RUDMAN & ROBBINS LLP
        SAMUEL H. RUDMAN
        ROBERT M.  ROTHMAN


           /S/ Robert M. Rothman
           ROBERT M.  ROTHMAN

        58 South Service Road, Suite 200
        Melville, NY  11747
        Telephone:  631/367-7100
        631/367-1173 (fax)

        COUGHLIN STOIA GELLER
           RUDMAN & ROBBINS LLP
        DARREN J. ROBBINS
        655 West Broadway, Suite 1900
        San Diego, CA 92101
        Telephone:  (619) 231-1058
        (619) 231-7423 (fax)

        *Attorneys for Plaintiff*

I:\Amaranth\Pleadings\070910 CPT.doc